**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Application of GHF GENERAL PARTNER
LIMITED and THE GHF GROUP LIMITED for an
*Ex Parte* Order to Conduct Discovery for Use in
Foreign Proceedings Pursuant to 28 U.S.C. § 1782

No. 23-MC-335(JGLC)

**MEMORANDUM OF LAW IN SUPPORT OF**
**RESPONDENT BADR ABDELHAMEED DHIA JAFAR'S MOTION TO QUASH**
**_EX PARTE_ SUBPOENAS ISSUED PURSUANT TO 28 U.S.C. § 1782**

CADWALADER, WICKERSHAM & TAFT LLP
Nicholas A. Gravante, Jr.
Amanda L. Devereux
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 504-6666

*Attorneys for Respondent*
*Badr Abdelhameed Dhia Jafar*

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    Respondent ............................................................................................ 3

    B.    The Cayman Litigation................................................................... 6

    C.    Applicants' Attempts at Service ................................................ 7

ARGUMENT ...................................................................................................................... 10

  I.   RESPONDENT WAS IMMUNE
      TO SERVICE OF PROCESS......................................................... 10

  II.  SERVICE OF PROCESS OF THE
      SUBPOENAS WAS INEFFECTIVE ........................................... 13

    A.    The Subpoenas Were Not
        Personally Served on Mr. Jafar ................................................ 13

    B.    Applicants Have Neither Sought Nor
        Been Granted Leave to Effect Service on
        Mr. Jafar through Alternative Means ..................................... 14

    C.    Applicants Failed to Effect Service
        through Alternative Means .......................................................... 16

  III. THE DEPOSITION SUBPOENA IS
      UNENFORCEABLE............................................................................ 17

  IV. DISCRETIONARY FACTORS WEIGH
      HEAVILY IN FAVOR OF QUASHING
      THE SUBPOENAS ........................................................................... 18

    A.    The Discovery Requests Are Unduly
        Intrusive and Burdensome .......................................................... 18

    B.    Applicants' Delay Also Weighs
        Heavily Against Allowing Discovery....................................... 23

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*6340 NB LLC v. Capital One, N.A.*,
    No. 20-CV-02500(JMA)(JMW),
    2022 WL 4386821 (E.D.N.Y. Sept. 22, 2022) ........................................................................14

*Aventis Pharma v. Wyeth*,
    No. M-19-70(DAB),
    2009 WL 3754191 (S.D.N.Y. Nov. 9, 2009) ..........................................................................25

*Black v. Vitello*,
    841 F. App'x 334 (2d Cir. 2021) ...........................................................................................15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012).......................................................................................................21

*Broumand v. Joseph*,
    522 F. Supp. 3d 8 (S.D.N.Y. 2021)..........................................................................................18

*City of Almaty, Kazakhstan v. Sater*,
    No. 19-CV-2645(JGK)(KHP),
    2023 WL 2088173 (S.D.N.Y. Feb. 16, 2023)...........................................................17, 21, 23

*DeCarvalhosa v. Adler*,
    298 A.D.2d 293 (1st Dep't 2002) ...........................................................................................15

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995)......................................................................................................22

*Fallahi v. Raisolsadati*,
    No. 22-CV-7013(JMF),
    2022 WL 4357550 (S.D.N.Y. Sept. 20, 2022).........................................................................10

*Great Lakes Reins. (UK) SE v. Herzig*,
    No. 16-CV-9848(PGG),
    2023 WL 4406149 (S.D.N.Y. July 7, 2023) ...........................................................................17

*Gushlak v. Gushlak*,
    486 F. App'x 215 (2d Cir. 2012) ............................................................................................22

*Highmore Fin. Co. I, LLC v. Greig Cos., Inc.*,
    No. 21-CV-11021(AT)(JW),
    2023 WL 3817332 (S.D.N.Y. June 5, 2023) ..........................................................................17

*In re Abraaj Inv. Mgmt. Ltd.*,
  No. 20-MC-229(VSB),
  2023 WL 2674752 (S.D.N.Y. Mar. 29, 2023) ...........................................................................21

*In re Batbold*,
  No. 21-MC-218(RA)(OTW),
  2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021) .............................................................................22

*In re Caratube Int'l Oil Co., LLP*,
  730 F. Supp. 2d 101 (D.D.C. 2010) ........................................................................................24

*In re Del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019)..........................................................................................20, 21

*In re Digitechnic*,
  No. C07-414(JCC),
  2007 WL 1367697 (W.D. Wash. May 8, 2007)........................................................................24

*In re Edelman*
  295 F.3d 171 (2d Cir. 2002)...........................................................................19, 21, 22, 23

*In Re Eli Lilly & Co.*,
  580 F. Supp. 3d 334 (E.D. Va. 2022),
  *aff'd in relevant part*, 37 F.4th 160 (4th Cir. 2022).................................................................19

*In re Elvis Presley Enters. LLC*,
  No. 15-MC-386(DLC),
  2016 WL 843380 (S.D.N.Y. Mar. 1, 2016) ..............................................................................24

*In re Escallon*,
  323 F. Supp. 3d 552 (S.D.N.Y. 2018)......................................................................................15

*In re Esses*,
  101 F.3d 873 (2d Cir. 1996)....................................................................................................22

*In re FourWorld Event Opportunities LP*,
  No. 22-MC-55(PHX)(DWL),
  2023 WL 155863 (D. Ariz. Jan. 11, 2023) ..............................................................................22

*In re Gemeinschaftspraxis Dr. Med. Schottdorf*,
  No. M19-88(BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ...........................................21

*In re Hornbeam Corp.*,
  722 F. App'x 7 (2d Cir. 2018) .................................................................................................21

*In re Hranov*,
  No. 21-MC-751(PKC),
  2022 WL 1261827 (S.D.N.Y. Apr. 28, 2022)....................................................................19, 20

*In re Hulley Enters., Ltd.*,
    358 F. Supp. 3d 331 (S.D.N.Y. 2019) .......................................................................24

*In re Kuwait Ports Auth.*,
    No. 20-MC-46(ALC),
    2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ...........................................................22

*In re Metallgesellschaft AG*,
    121 F.3d 77 (2d Cir. 1997) ........................................................................................22

*In re Three Arrows Cap., Ltd.*,
    647 B.R. 440 (Bankr. S.D.N.Y. 2022) .....................................................................17

*In re WinNet R CJSC*,
    No. 16-MC-484(DLC),
    2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017) .....................................................5, 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ........................................................................................ *passim*

*Laggner v. Parsa*,
    No. 3:22-MC-80328(WHO),
    2023 WL 163579 (N.D. Cal. Jan. 11, 2023) .............................................................22

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ................................................................................18, 21

*Nascimento v. Faria*,
    600 F. App'x 811 (2d Cir. 2015) ..............................................................................24

*Saget v. Trump*,
    351 F. Supp. 3d 251 (E.D.N.Y. 2019) ......................................................................23

*Sergeeva v. Tripleton Int'l Ltd.*,
    834 F.3d 1194 (11th Cir. 2016) ...........................................................................20, 21

*Simmons v. Fervent Elec. Corp.*,
    No. 14-CV-1804(ARR)(MDG),
    2016 WL 3661274 (E.D.N.Y. July 5, 2016) .............................................................14

*Tachiona v. United States*,
    386 F.3d 205 (2d Cir. 2004) .................................................................10, 11, 12, 13

*Tuqui Tuqui Dominicana, S.R.L. v. Castillo*,
    No. 19-CV-108(NRB),
    2020 WL 1689763 (S.D.N.Y. Apr. 7, 2020) .............................................................13

**Statutes**

28 U.S.C. § 1782 ................................................................................ *passim*

**Treaties**

United Nations Convention on Privileges and Immunities,
   T.I.A.S. No. 6900, 21 U.S.T. 1418, 1970 WL 104387 ................................................... *passim*

Vienna Convention on Diplomatic Relations and
   Optional Protocols on Dispute,
   T.I.A.S. No. 7502, 23 U.S.T. 3227, 1972 WL 122692 ................................................... *passim*

**Rules**

Fed. R. Civ. P. 4 ........................................................................14, 15, 16

Fed. R. Civ. P. 45 ................................................................................ *passim*

N.Y. C.P.L.R. § 308 ............................................................................15, 16

N.Y. R. Prof. Conduct 3.3(d) ..................................................................6

**Other Authorities**

Wright & Miller, *Fed. Practice and Procedure*,
   9A Fed. Prac. & Proc. Civ. § 2454 (3d ed.) ..........................................................13

Respondent Badr Abdelhameed Dhia Jafar ("**Respondent**" or "**Mr. Jafar**"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion to quash Applicants GHF General Partner Limited and The GHF Group Limited's (together, "**Applicants**") subpoenas, dated September 15, 2023 (the "**Subpoenas**"), authorized by this Court's *Ex Parte* Order dated September 15, 2023 (the "**Order**") granting GHF's *ex parte* Application under 28 U.S.C. § 1782.

## PRELIMINARY STATEMENT

The Subpoenas are procedurally defective and should be quashed on four different grounds. *First*, as a threshold matter, when Applicants attempted to serve Mr. Jafar with the Subpoenas, Mr. Jafar was immune from service of process because he was in the United States in his formal capacity as a representative of the United Arab Emirates (the "**UAE**") during the United Nations' (the "**U.N.**") General Assembly held in New York City in September 2023.[1] Under well-established precedent, service of process for the Subpoenas was not effective, and could not have been effective, because of the protections afforded to Mr. Jafar by Article 29 of the Vienna Convention on Diplomatic Relations and Optional Protocols on Dispute and Article IV, Section 11(g) of the U.N. Convention on Privileges and Immunities. For this reason alone, the Subpoenas should be quashed.

*Second*, the unprofessional attempts to serve Mr. Jafar were not effective and did not comply with Federal Rule of Civil Procedure 45 for multiple reasons. As described below and in the accompanying Declarations, Mr. Jafar and his family experienced extraordinary harassment at the hands of the process servers. Nor can Applicants claim that they have effected service through alternative means, because Rule 45 requires personal delivery to Mr. Jafar, which Applicants

---

[1]   *See* Declaration of Badr Abdelhameed Dhia Jafar, dated October 6, 2023 ("**Jafar Decl.**") ¶¶ 1-11, Exs. 1-2.

concede did not occur.  Moreover, Applicants have failed to seek, much less receive, authorization from the Court to effect service through alternative means.  And, in any event, Applicants' efforts to effect service through alternative means, were not valid under federal or New York law.  These efforts appear to have consisted of attempts to leave a package with unnamed hotel employees, accosting the driver of a car hired by Mr. Jafar during his visit, accosting Mr. Jafar's wife (who, like him, was attending U.N. meetings as a UAE delegate and was immune from service of process), throwing a package at a closed hotel entrance, and an email.  Thus, the Court should decline to enforce the Subpoenas on the ground that service has not been effected.

*Third*, the deposition Subpoena is unenforceable on its face.  By commanding Mr. Jafar to appear for a deposition in New York, the deposition Subpoena runs afoul of the clear territorial restriction set forth in Federal Rule Civil Procedure 45(c)(1), which provides that non-parties can be required to appear for a deposition only "within 100 miles of where the person resides, is employed, or regularly transacts business in person."  As Applicants concede, Mr. Jafar does not reside, work, or regularly transact business in person in the United States, let alone within this district.  Rather, he resides and works in the UAE, more than six thousand miles from here.  Accordingly, the deposition Subpoena should be quashed.

*Finally,* the Supreme Court's discretionary *Intel* factors counsel that the Subpoenas should be quashed in their entirety.  As discussed below, the Subpoenas are unduly burdensome and intrusive.  Responsive documents in Mr. Jafar's possession, if any, are be located in the UAE, not in the United States; and compliance with the deposition Subpoena would require Mr. Jafar to make a special trip and fly roundtrip from the UAE to New York—a distance of more than 6,000 miles each way—a far greater distance than the 100-mile limit for deposition subpoenas set forth in Rule 45.

Moreover, despite the Cayman Litigation having been filed more than three years ago, and plain evidence that ███████████████████████████████████████████████ ███████████████████ Applicants have waited until the virtual eve of trial—which is scheduled to begin ████████████████████████████—to pursue a 1782 application. And Applicants have never sought discovery from Mr. Jafar in the UAE, where any responsive documents are located and where he lives.  The timing of the Application, █████████████ ████████████████████████████████████████████████████████████ █████████████████████—by itself warrants denial of the Application.  The extreme untimeliness of Applicants' Application would, if the Subpoenas were enforced, substantially increase the burden for Mr. Jafar by unnecessarily creating a fire drill.  As other courts presented with similar requests have noted, it is also unlikely that the requested discovery could be provided in time to provide effective assistance in the foreign proceedings.  Accordingly, the Court should decline to exercise its discretion to authorize the requested discovery pursuant to Section 1782 and should issue an Order quashing the Subpoenas in their entirety.

## BACKGROUND

### A. Respondent

Respondent Badr Abdelhameed Dhia Jafar is a businessman, philanthropist, and social entrepreneur who resides and works in the UAE.  *See* Jafar Decl. ¶¶ 1-2.  Mr. Jafar does not reside, work, or transact business in person in New York or elsewhere in the United States.  *Id.* ¶ 2.  Mr. Jafar was appointed and currently serves as the COP28 UAE's Special Representative for Business and Philanthropy, and a member of the Advisory Committee, for the 2023 U.N. Climate Change Conference, commonly referred to as "COP28" ("**COP28**").  *Id.* ¶ 5.  The U.N. Climate Change Conference serves as the formal annual meeting of the parties to the United Nations Framework Convention on Climate Change.  *Id.*  COP28, which will be the twenty-eighth annual U.N. Climate

Conference, will take place in Dubai from November 30, 2023 through December 12, 2023. *Id.* Mr. Jafar is also the Chairman for the Business and Philanthropy Forum for COP28, which is COP28 Presidency's official forum to engage the business and philanthropy sectors during COP28 UAE. *Id.* Mr. Jafar's dedication to climate advocacy and his status as an appointed Special Representative for the U.N.'s COP28 are well-documented. Over the years, Mr. Jafar has made various public appearances and statements in connection with his involvement with U.N. initiatives, including as a member of the U.N. Secretary General's High Level Panel for Humanitarian Financing, as a member of the U.N. Educational, Scientific and Cultural Organization (UNESCO) International Commission for the Futures of Education, as well as his more recent work for the U.N.'s COP28 on behalf of the UAE. *Id.* ¶ 8. Mr. Jafar has been interviewed extensively by the international press in relation to these formal appointments over the years, including more recently by CNN regarding his work for COP28 on behalf of the UAE.[2] *Id.*

From September 15 to September 24, 2023, Mr. Jafar visited New York for the sole purpose of attending meetings in connection with the U.N. Climate Ambition Summit as part of the U.N. General Assembly meetings and as an official UAE delegate. *Id.* ¶ 6. Mr. Jafar attended those meetings as an official UAE delegate and as the appointed COP28 Special Representative for

---

[2] *See e.g.*, Declaration of Amanda L. Devereux, dated October 6, 2023, Ex. 1 (reporting on speech given by Mr. Jafar regarding COP28 at the World Economic Forum's annual meeting in Davos, Switzerland in January 2023); *id.*, Ex. 2 (September 8, 2023 article quoting Mr. Jafar, as COP28 Special Representative for Business and Philanthropy, regarding plans for COP28); *id.*, Exs. 2-3 (picturing Mr. Jafar at a September 18, 2023 meeting held at the UAE Permanent Mission to the U.N. with the President of Kenya); *id.*, Ex. 5 (picturing Mr. Jafar ringing NYSE bell with UAE COP28 delegation on September 19, 2023); *see also* Interview of Mr. Jafar, CNN, July 18, 2023, available at https://youtu.be/ysliJLH72Is (interview regarding COP28); Closing Remarks by Mr. Jafar, U.N. General Assembly High-Level Event on SDGs Innovation, September 17, 2017, available at https://youtu.be/BVXQ2RqNP4w.

Business and Philanthropy and Chair of the COP28 Business and Philanthropy Climate Forum.[3]
*Id.* ¶¶ 6-11.  Annexed to Mr. Jafar's Declaration are copies of email dated October 2, 2023 from the Chief of Staff to the Permanent Representative of the Permanent Mission of the UAE to the U.N. confirming Mr. Jafar's formal role during his trip to New York, and photographs of Mr. Jafar's U.N. security badges, including a blue U.N. grounds pass indicating his status as a member of the UAE delegation.[4]  *Id.* ¶¶ 6-7, Exs. 1-2.

Troublingly, Applicants and their process servers were ***fully aware*** of Mr. Jafar's status as a Special Representative for the U.N.'s COP28,[5] yet they persisted in filing the Application and attempting to serve process on Mr. Jafar *and* his wife while they were in New York to attend U.N. meetings.[6]

---

[3]   Mr. Jafar's wife, Razan Khalifa Sheikh Ahmed Al Mubarak, is a prominent international figure in environmental conservation.  Ms. Al Mubarak, who is a full-time UAE government employee, is the Managing Director of the Environment Agency – Abu Dhabi, is the President of the International Union for Conservation of Nature (IUCN), and serves as the COP28 U.N. Climate Change High-Level Champion.  *See* Jafar Decl. ¶¶ 3-4; Al Mubarak Decl. ¶¶ 2-3.  From September 15 to September 24, 2023, Ms. Al Mubarak visited New York in her capacity as U.N. Climate Change High Level Champion and as a representative of the UAE to attend various official meetings related to the U.N. General Assembly and the U.N. Climate Ambition Summit in New York.  Al Mubarak Decl. ¶¶ 2-3.

[4]   *See* Delegates Handbook 2023 – Seventy-eighth session of the General Assembly of the United Nations, available at https://www.un.org/en/ga/78/pdf/delegates_handbook_2023_EN.pdf, at 15.

[5]   *See* 9/8/2023 Casewell Decl. ¶ 4 ("Similarly according to public sources, both Badr and Ms. Al Mubarak are helping organize a UN Climate Change Conference called COP28 that is being hosted in the UAE in November and December 2023.").

[6]   Given that it was common knowledge that the U.N. was convening, and holding its Climate Ambition Summit, the week of Mr. Jafar's visit, it strains credibility that Applicants (who are sophisticated entities with considerable resources) and their process servers, knowing that Mr. Jafar and his wife were official representatives of the U.N.'s COP28, were somehow unaware that Mr. Jafar and his wife were in New York to attend U.N. meetings.  This potential lack of candor is all the more concerning given that Mr. Jafar, as a non-party to the Cayman Litigation, does not have access to the full docket in the Cayman Litigation and is unable to ascertain the extent to which Applicants' statements regarding those proceedings may be misleading.  *See In re WinNet R CJSC*, No. 16-MC-484(DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) ("The duty of candor is, if anything, more critical when *ex parte* applications are made to a court.") (denying

## B. The Cayman Litigation

The Cayman Litigation was filed *over three years ago*, in September 2020.   *See* Goucke

Decl., Ex. I.  Trial in the Cayman Litigation is scheduled to begin ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Respondent is not, and has never been, a party to the Cayman Litigation.

Jafar Decl. ¶ 38.  Moreover, the parties and entities relevant to the Cayman Litigation are from the

Cayman Islands and the UAE, not the United States, and the transactions at issue took place outside

the United States.



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮The Cayman Court granted that request in part on April 30,

2023, holding that "as a matter of fact the Documents [held by Mr. Jafar and relating to particular

---

§ 1782 petition due, in part to lack of candor); N.Y. R. Prof. Conduct 3.3(d) ("In an ex parte
proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will
enable the tribunal to make an informed decision, whether or not the facts are adverse.").

[7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

topics at issue in the Cayman Litigation] are to be regarded as within the Plaintiff's [A.D. Jafar's] power." Goucke Decl., Ex. C ¶¶ 7-8. On May 5, 2023, Forbes Hare, a Cayman law firm representing A.D. Jafar, sent Mr. Jafar a letter (the "**May 5 Letter**"), referencing the Cayman Court's April 30, 2023 Order and asking Mr. Jafar, on his father's behalf, to produce documents in his possession related to the loans A.D. Jafar made to the Abraaj Group in December 2017. Jafar Decl. ¶ 38, Ex. 3. On May 19, 2023, Mr. Jafar sent his father an email stating that while he disagreed with the Cayman Court's finding that his documents are in the possession, custody, or control of his father, as a courtesy to his father he would grant Forbes Hare access to his emails for the period December 15, 2017 to January 15, 2018. *Id.* ¶ 39; ████████████████. Those emails were then made available to Forbes Hare.[8] Jafar Decl. ¶ 39.

### C. Applicants' Attempts at Service

Applicants' first attempt to serve the Subpoenas on Mr. Jafar occurred on Wednesday, September 20, 2023.[9] Jafar Decl. ¶ 12. When he left his hotel that morning to attend a nearby meeting, a man who was unknown to Mr. Jafar abruptly approached him while yelling his name very loudly and carrying a package. *Id.* ¶¶ 13-14. Startled and concerned for his safety, Mr. Jafar, who was talking on his cellphone at the time, briefly indicated that he did not know who the man was and continued walking to his meeting and did not engage with the man. *Id.* ¶¶ 13-17. The man followed Mr. Jafar to the building where Mr. Jafar was attending a meeting, repeatedly yelling Mr. Jafar's name in an aggressive manner. *Id.* ¶ 14. The man continued to follow Mr. Jafar until

---

[8] Thus, Applicants' statement they have not "obtained discovery directly" from Mr. Jafar, Mot. at 3, is misleading. They have, in fact, received the documents Mr. Jafar provided to his father.

[9] Applicants' attempts at service are described in the accompanying Declarations submitted by Badr Abdelhameed Dhia Jafar, Razan Khalifa Sheikh Ahmed Al Mubarak, Darinell Rodriguez, and Henry Mercado. Ms. Al Mubarak is Mr. Jafar's wife, and Mr. Rodriguez and Mr. Mercado are, respectively, a security guard and a driver who witnessed Applicants' attempts to serve process while performing work for the U.N. Applicants' version of events is described in the Black and Baldwin Declarations submitted by Applicants. *See* ECF Nos. 12-13.

Mr. Jafar went through the security checkpoint for his meeting by presenting his credentials. Rodriguez Decl. ¶ 9.  Mr. Jafar did not know who the man was, what he wanted, or what the package contained.  Jafar Decl. ¶ 17.  And, given that Mr. Jafar was in New York to attend U.N. meetings and the associated security concerns, Mr. Jafar believed the man to be a hostile protestor of some kind.  *Id.* ¶¶ 14-18.

When Mr. Jafar left his morning meeting on September 20, 2023, the same man who had harassed him that morning was waiting outside the building.  *Id.* ¶ 20.  As Mr. Jafar began to walk to his hotel, the man yelled at him and aggressively attempt to approached him without identifying himself or explaining what he was trying to do.  *Id.* ¶¶ 20-21.  A nearby individual who was employed by the U.N. as a security advisor observed the events described above and intervened out of concern for Mr. Jafar's safety.  Rodriguez Decl. ¶¶ 2, 11.  After the security advisor escorted Mr. Jafar into the hotel, the man entered the hotel lobby and, finding Mr. Jafar was no longer there, attempted to leave a package with an unnamed "woman at a reception desk" and an unnamed concierge.  *See id.* ¶¶ 13-14; Black Decl. ¶¶ 7-8.

Later that day, as Mr. Jafar was leaving his hotel to attend a diplomatic reception, the same man who had harassed him earlier approached him aggressively as he attempted to enter a car waiting for him on the street outside the hotel.  Jafar Decl. ¶ 24.  Doormen from the hotel noticed the man moving toward Mr. Jafar in a threatening manner and immediately created a physical buffer so that Mr. Jafar could his car safely.  *Id.*  Once again, the man did not explain who he was or what he was trying to do.  *Id.*

The next day, Thursday, September 21, 2023, Mr. Jafar exited his hotel carrying his one-year-old daughter in his arms, planning to take her for a walk in Central Park.  *Id.* ¶ 26.  As soon as Mr. Jafar left his hotel, the man who had harassed him the day before ran up to him, shoved a

camera in his face, and tried to force him to take the package he was holding by pushing it at Mr. Jafar notwithstanding that Mr. Jafar was carrying his infant daughter. *Id.* ¶ 27. Fearing for his daughter's safety, Mr. Jafar turned back to return to his hotel. *Id.* ¶ 28. Undeterred, however, the man chased after Mr. Jafar and his daughter and attempted to enter the hotel to pursue them. *Id.* Hotel personnel intervened to enable Mr. Jafar and his daughter to safely enter the hotel and then closed the hotel's front doors to prevent the man from entering. *Id.* The man then threw a package at the hotel's closed entrance. *Id.* ¶ 30. Mr. Jafar, who still did not know who the man was or what he was doing, and his infant daughter were both extremely startled by the experience, which left Mr. Jafar feeling intimidated and fearful. *Id.* ¶¶ 27-29, 31. Mr. Jafar's six-year-old daughter, who witnessed these events from the hotel lobby, was distraught. *Id.* ¶ 29.

Later in the day on September 21, 2023, while Mr. Jafar was returning to his hotel from a meeting, a different, unknown man ran approached Mr. Jafar in an erratic, without attempting to identify himself, once again prompting hotel personnel to shield Mr. Jafar and escort him safely inside. *Id.* ¶ 33. That same day, an unknown man rapidly approached Mr. Jafar's wife with a package, shouting her name, as she was returning to the hotel from meetings at the UAE Permanent Mission to the UN. Al Mubarak Decl. ¶¶ 6-7. Like Mr. Jafar, Ms. Mubarak did not know who the man was, what he wanted, or what was in the package he was carrying. *Id.* ¶ 7. Startled and frightened, Ms. Mubarak rushed to the hotel. *Id.* ¶ 8. As Ms. Mubarak rushed to the hotel, the man attempted to force the package upon her and shoved it against her without explanation. *Id.* ¶ 9.

The man who accosted Ms. Mubarak then attempted to place a package on the windshield of a car hired by Mr. Jafar during his visit, prompting the drivers for both Mr. Jafar and Ms. Mubarak to seek help from the police. Mercado Decl. ¶¶ 9-11, 13. As a result of the above-described events, out of serious concern for the personal safety of their family, Mr. Jafar and Ms.

Mubarak hired a personal security detail for the remainder of their visit to New York.  Al Mubarak

Decl. ¶ 12.  Mr. Jafar was not approached again after September 21, 2023.

**ARGUMENT**

**I.     RESPONDENT WAS IMMUNE TO SERVICE OF PROCESS**

Mr. Jafar was immune from service of process because he was in this district as a delegate

of the UAE to attend a U.N. conference.

It is well-established that individuals who visit the United States as delegates to United

Nations conferences or meetings are entitled to diplomatic immunity from service of process

pursuant to Article 29 of the Vienna Convention on Diplomatic Relations and Optional Protocols

on Dispute (the "**Vienna Convention**"), T.I.A.S. No. 7502, 23 U.S.T. 3227, 1972 WL 122692

(U.S. Treaty), and Article IV, Section 11(g) ("**Section 11(g)**") of the United Nations Convention

on Privileges and Immunities (the "**UN Convention**"), T.I.A.S. No. 6900, 21 U.S.T. 1418, 1970

WL 104387 (U.S. Treaty).  *See Tachiona v. United States*, 386 F.3d 205, 215-220 (2d Cir. 2004)

(explaining interplay of treaties and holding individuals visiting New York to attend U.N.

Millennium Summit as representatives of Zimbabwe were immune from service of process during

their visit pursuant to Article 29 of the Vienna Convention and Article 11(g) of the U.N.

Convention); *see also Fallahi v. Raisolsadati*, No. 22-CV-7013(JMF), 2022 WL 4357550, at *1

(S.D.N.Y. Sept. 20, 2022) (denying motion for substitute service, holding individual was immune

from service of process while visiting United States to attend opening of U.N. General Assembly

as representative of Iran, pursuant to Article 29 of the Vienna Convention and Section 11(g) of the

UN Convention) (citing *Tachiona*).

As the Second Circuit explained in *Tachiona*, the "immunities afforded temporary

representatives . . . who visit the United States for a U.N. conference are set forth in Article IV,

-10-

section 11 of the U.N. Convention on Privileges and Immunities." *Tachiona*, 386 F.3d at 215.

Section 11 of the U.N. Convention provides:

> ***Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, shall, while exercising their functions and during their journey to and from the place of meeting, enjoy the following privileges and immunities:***
>
> (a) immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind;
>
> (b) inviolability for all papers and documents;
>
> (c) the right to use codes and to receive papers or correspondence by courier or in sealed bags;
>
> (d) exemption in respect of themselves and their spouses from immigration restrictions, alien registration or national service obligations in the state they are visiting or through which they are passing in the exercise of their functions;
>
> (e) the same facilities in respect of currency of exchange restrictions as are accorded to representatives of foreign governments on temporary official missions;
>
> (f) the same immunities and facilities in respect of their personal baggage as are accorded to diplomatic envoys, and also
>
> (g) ***such other privileges, immunities and facilities not inconsistent with the foregoing as diplomatic envoys enjoy***, except that they shall have no right to claim exception from customs duties on goods imported (otherwise than as part of their personal baggage) or from excise duties or sales taxes.

U.N. Convention, art. IV, § 11 (emphasis added).

Thus, Section 11(g) of the U.N. Convention provides that foreign delegates visiting the United States to attend U.N. conferences are afforded full diplomatic immunity during their visits, including the full diplomatic protections and immunities provided for in Articles 29 and 31(1) of the Vienna Convention. *Tachiona*, 386 F.3d at 215-19.

Article 29 of the Vienna Convention provides:

> The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom, or dignity.

Vienna Convention, art. 29. Article 29's provision for inviolability of the person has long been understood to prohibit service of process on individuals entitled to diplomatic immunity apart from the narrow exceptions set forth in Article 31(1) of the Vienna Convention. *See Tachiona*, 386 F.3d at 221-23. Article 31(1) of the Vienna Convention provides:

> *A diplomatic agent* shall enjoy immunity from the criminal jurisdiction of the receiving State. He *shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:*
>
> (a) *a real action relating to private immovable property situated in the territory of the receiving State*, unless he holds it on behalf of the sending State for the purposes of the mission;
>
> (b) *an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person* and not on behalf of the sending State;
>
> (c) *an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions*.

Vienna Convention, art. 31(1) (emphasis added); *see also Tachiona*, 386 F.3d at 219-220. Thus, pursuant to binding Second Circuit precedent, individuals visit the United States to attend U.N. conferences as delegates are immune from service of process during their visits unless one of the narrow exceptions set forth in Article 31(1) of the Vienna Convention applies.

When Applicants attempted to serve the Subpoenas on him, Mr. Jafar was visiting New York as a delegate from the UAE for meetings held in September 2023 as part of the U.N. General Assembly. Jafar Decl. ¶¶ 3-7, Exs. 1-2. Thus, Mr. Jafar was entitled to diplomatic immunity, including immunity from service of process during his visit pursuant to Section 11(g) of the U.N.

Convention and Article 29 of the Vienna Convention. *See Tachiona*, 386 F.3d at 220. It is also indisputable that none of the exceptions set forth in Article 31(1) of the Vienna Convention apply here. The Cayman Litigation concerns private business dealings of third parties related to a Cayman Islands company. It does not concern "immovable property situated in" the United States, "an action relating to succession," or "an action relating to any professional or commercial activity exercised by" Mr. Jafar in the United States. Vienna Convention, art. 31(1). Thus, the Court should enter an order quashing the Subpoena and vacating its prior *Ex Parte* Order.

## II.    SERVICE OF PROCESS OF THE SUBPOENAS WAS INEFFECTIVE

### A. The Subpoenas Were Not Personally Served on Mr. Jafar

The Subpoenas should also be quashed on a basis independent from Mr. Jafar's immunity from service of process: the Subpoenas were not validly served. Under Rule 45, service of "a subpoena requires delivering a copy to the named person[.]" Fed. R. Civ. P. 45(b)(1). It has long been understood that Rule 45(b)(1) requires in-person service of the subpoena to the individual being subpoenaed. *See, e.g.*, *Tuqui Tuqui Dominicana, S.R.L. v. Castillo*, No. 19-CV-108(NRB), 2020 WL 1689763, at *6 (S.D.N.Y. Apr. 7, 2020) (holding service by mail insufficient, stating "[u]nder Rule 45(b)(1), personal service is required when an individual is subpoenaed") (quotation marks and citation omitted); *see also* Wright & Miller, *Fed. Practice and Procedure,* 9A Fed. Prac. & Proc. Civ. § 2454 (3d ed.).

Here, Applicants failed to personally deliver their subpoenas to Mr. Jafar while he was physically present in New York. *See* Jafar Decl. ¶¶ 13-33. Not one of the process servers who interacted with Mr. Jafar identified themselves, told Mr. Jafar what they were doing, or explained the contents of the package they were attempting to force upon him. *See id.* ¶¶ 13-33; Rodriguez Decl. ¶ 12. And it is undisputed that Mr. Jafar never accepted the package—which is unsurprising

given the harassing and frightening tactics used by the process servers. *See* Jafar Decl. ¶¶ 13-33, 37; Rodriguez Decl. ¶¶ 7-9, 11-12.

### B. Applicants Have Neither Sought Nor Been Granted Leave to Effect Service on Mr. Jafar through Alternative Means

In cases where courts have taken the alternate view and permitted service of non-party subpoenas in a manner other than in-person delivery, they have done so only ***after*** the serving party made a showing of diligent efforts to effect personal service ***and*** moved the court for permission to effect service through alternative means. *Simmons v. Fervent Elec. Corp.*, No. 14-CV-1804(ARR)(MDG), 2016 WL 3661274, at *1 (E.D.N.Y. July 5, 2016) (citing cases) (denying motion to hold deponent in contempt where movant had not demonstrated diligent efforts before attempting service through alternative means of mail and leaving subpoena with deponent's spouse at his residence).[10]

As noted above, Rule 45, which governs service of subpoenas, states only that subpoenas must be served by "delivering a copy to the named person[.]" Fed. R. Civ. P. 45(b)(1). Federal Rule of Civil Procedure 4, in contrast, lists the manners of service that are acceptable and provides that an individual "may be served in a judicial district of the United States by":

> (1) ***following state law for serving a summons*** in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
>
> (2) doing any of the following:
>
> > (A) ***delivering a copy*** of the summons and of the complaint ***to the individual personally***;

---

[10]  *See also, e.g., 6340 NB LLC v. Capital One, N.A.*, No. 20-CV-02500(JMA)(JMW), 2022 WL 4386821, at *2-*3 (E.D.N.Y. Sept. 22, 2022) (granting motion for alternative service following five unsuccessful attempts to serve in-person at recipient's residence and place of business).

(B) leaving a copy of each *at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides ther*e; or

(C) delivering a copy of each *to an agent authorized by appointment or by law to receive service of proces*s.

Fed. R. Civ. P. 4(e) (emphasis added).

With respect to Rule 4(e)(1), New York law provides that service upon an individual "shall be made" within the state by (1) *in-person delivery*; (2) delivery "to a person of suitable age and *discretion at the actual place of business, dwelling place or usual place of abode of the person* to be served *and by either mailing the summons to the person to be served at his or her last known residence* or . . . at his or her actual place of business"; (3) delivery to a designated agent for service of process; (4) "where service under paragraphs one and two cannot be made with due diligence, *by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person* to be served and by" mailing the summons to the person's last known residence or actual place of business; or (5) *in such manner as the court, upon motion* without notice, *directs,* if service is impracticable under paragraphs one, two and four of this section."  N.Y. C.P.L.R. § 308 (emphasis added).

Thus, under New York law, alternative means of service are permitted *only if* the enumerated methods are impracticable *and* the court "upon motion" has ordered an alternative means of service.  *See Black v. Vitello*, 841 F. App'x 334, 335-36 (2d Cir. 2021); *DeCarvalhosa v. Adler*, 298 A.D.2d 293, 295 (1st Dep't 2002) (holding where no motion for substitute service is made, alternative method service will be retroactively deemed improper even if personal service was impracticable).  Here, Applicants have neither sought nor been granted permission to effect service through alternative means, which they easily could have done in their *ex parte* Application.

## C.  Applicants Failed to Effect Service through Alternative Means

Even if Applicants had been authorized to effect service through alternative means (and they were not—and could not have been, given Mr. Jafar's immunity from service), their efforts did not result, and could not have resulted, in proper service.  *First*, leaving copies of the Subpoenas with unnamed hotel personnel, *see* Black Decl. ¶¶ 7-8, is patently deficient.  The hotel is not Mr. Jafar's "dwelling place or usual place of abode" or his "usual place of business."  Fed. R. Civ. P. 4(e)(2)(B); N.Y. C.P.L.R. § 308(1)-(2); *see also In re Escallon*, 323 F. Supp. 3d 552, 556 (S.D.N.Y. 2018) ("Although the affidavits of service submitted by petitioner indicate that copies of the service papers were left with the doorman at a building where the Ardilas have an apartment, this is not the kind of personal service required by § 1782.") (citation omitted).

*Second*, efforts to accost and personally serve Mr. Jafar's driver and his spouse (neither of whom accepted the package) in public do not comply with the law, which requires that summonses be left "with a person of suitable age and discretion" at the individual's "dwelling place or usual place of abode" with a person who resides there, or the individual's "usual place of business." Fed. R. Civ. P. 4(e)(2)(B); N.Y. C.P.L.R. §§ 308(1)-(2).[11]  Nor does the law permit service by means of "dropping" or throwing packages at a person or a hotel.  *See* Black Decl. ¶ 9; Jafar Decl. ¶¶ 30, 36.  Given the patently deficient nature of their methods, it is hard to see what the process servers hoped to achieve through their unprofessional conduct apart from harassing, intimidating, and embarrassing Mr. Jafar and his family.[12]

---

[11]  Nor was there any basis to conclude that the driver was an appropriate person through whom to effect service on Mr. Jafar, and Mr. Jafar's wife, who was attending U.N. meetings as a UAE delegate, was herself immune from service during her visit.

[12]  Further, the process servers' knowledge that Mr. Jafar and his family were staying at the Hotel, which was strictly confidential precisely because of security concerns, is left unexplained in the Black Declaration, suggesting that the process servers may have acted unlawfully in gaining access to Mr. Jafar's itinerary.

*Third*, neither federal nor New York law list email as a method of service, and Applicants neither sought nor received authorization to serve Mr. Jafar by email.  Nor would email service be appropriate here, where the Court's jurisdiction over Mr. Jafar could *only* be exercised by virtue of process being properly served on him while he is physically present in the district.  *See In re Three Arrows Cap., Ltd.*, 647 B.R. 440, 450 (Bankr. S.D.N.Y. 2022) ("allowing [Applicants] to serve by email under the guise of 'alternative' service would create an exception that would render Rule 45's explicit territorial limits meaningless given the ubiquity of email and social media.").

### III.    THE DEPOSITION SUBPOENA IS UNENFORCEABLE

The deposition Subpoena commands Mr. Jafar to appear for a deposition in New York. ECF No. 15 at 5.  However, Mr. Jafar, does not reside, work, or regularly transact business in person within 100 miles of New York.  Jafar Decl. ¶¶ 1-2.  The deposition Subpoena should, therefore, be quashed.

Rule 45(c)(1) provides that "[*a*] *subpoena may command a person to attend a* trial, hearing, or *deposition . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person*[.]"  Fed. R. Civ. P. 45(c)(1)(A)(emphasis added).    Thus, the deposition Subpoena should be quashed because it is unenforceable under Rule 45(c)(1)(A).  *See City of Almaty, Kazakhstan v. Sater*, No. 19-CV-2645(JGK)(KHP), 2023 WL 2088173, at *2 (S.D.N.Y. Feb. 16, 2023) (rejecting arguments that Rule 45's 100-mile geographical limit could be circumvented by conducting nonparty deposition by videoconference or in United Kingdom or Belgium).[13]

---

[13]  *See also, e.g.*, *Great Lakes Reins. (UK) SE v. Herzig*, No. 16-CV-9848(PGG), 2023 WL 4406149, at *3 (S.D.N.Y. July 7, 2023) (quashing trial subpoena for party officers residing in United Kingdom); *Highmore Fin. Co. I, LLC v. Greig Cos., Inc.*, No. 21-CV-11021(AT)(JW), 2023 WL 3817332, at *2 (S.D.N.Y. June 5, 2023) (quashing nonparty deposition subpoenas for where no individuals with relevant knowledge lived or worked within 100-mile radius of New

## IV. DISCRETIONARY FACTORS WEIGH HEAVILY IN FAVOR OF QUASHING THE SUBPOENAS

Even if Applicants had effected proper service (and they have not and could not), discretionary factors weigh heavily in favor of quashing the Subpoenas. "[A] district court is not required to grant a § 1782(a) discovery application simply because it has the [statutory] authority to do so." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). In *Intel*, the Supreme Court set forth four factors that "bear consideration" in deciding whether to exercise discretion under 28 U.S.C. § 1782: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether "the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the discovery requests are "unduly intrusive or burdensome." *Id.* at 264-65.     Additionally, "if a § 1782 application is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application *in toto*." *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015) (citation omitted). Here, discretionary factors, including the fourth *Intel* factor, weigh heavily in favor of a finding that the Subpoenas should be quashed.

### A. The Discovery Requests Are Unduly Intrusive and Burdensome

Mr. Jafar is a UAE national who does not reside, work, or regularly transact business in person in the United States. *See* Jafar Decl. ¶¶ 1-2. Even if the Subpoenas were properly served (and they were not), the Court's jurisdiction over Mr. Jafar would be "tag jurisdiction," created

---

York); *Broumand v. Joseph*, 522 F. Supp. 3d 8, 13, 23-24 (S.D.N.Y. 2021) (residents of California and Virginia could not be compelled to provide remote testimony for arbitration in New York).

only by personal service on Mr. Jafar while he was briefly physically present in New York on unrelated matters.  *See In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002).  And the Subpoenas seek discovery concerning transactions involving loans from a UAE national to a Cayman Islands entity which occurred outside of the United States, and communications between individuals who were located outside of the United States at the time.  It is undisputed that any responsive documents Mr. Jafar might possess are located in the UAE, not in the United States.  *See* Jafar Decl. ¶¶ 38, 40.  And because Mr. Jafar does not live or work in the United States, complying with the deposition Subpoena would require him to make a special trip to New York for the purpose and to undertake an incredibly long journey of more than six thousand miles each way.[14]  Accordingly, Applicants' requests—which would require Mr. Jafar to travel from the UAE to New York for a deposition and to search for and produce documents which are not located in the United States— are unduly intrusive and burdensome.  Indeed, a district court in the Fourth Circuit recently denied a similar § 1782 request, calling it "nonsensical":

> First, the discovery Eli Lilly seeks appears to be unduly burdensome.  Eli Lilly seeks a raft of materials related to Novartis's deal with Genentech, but ***there is no indication that any of these materials are located in the Eastern District of Virginia or even in the United States***.  Eli Lilly in essence requests that a substantial volume of data and materials located abroad be brought into the United States for subsequent use in proceedings abroad, ***a nonsensical result***.

*In Re Eli Lilly & Co.*, 580 F. Supp. 3d 334, 341-42 (E.D. Va. 2022) (footnote omitted; emphasis added), *aff'd in relevant part*, 37 F.4th 160, 168 (4th Cir. 2022).  Similarly, in a recent decision in this district, the court denied a Section 1782 application, finding the fourth *Intel* factor weighed

---

[14]  *See, e.g.*, Emirates website, "Flights from New York John F. Kennedy (JFK) to Dubai (DXB) https://www.emirates.com/us/english/destinations/jfk/dxb/flights-from-new-york-john-f-kennedy-to-dubai/, last visited October 5, 2023 (listing one-way flights from New York City to Dubai ranging from 12 hours and 30 minutes to 17 hours and 10 minutes in length).

against allowing discovery where "it appear[ed] that the bulk of the requests would involve materials located outside the United States, as indicated by the United Kingdom location of [respondent's] data archives." *In re Hranov*, No. 21-MC-751(PKC), 2022 WL 1261827, at \*7 (S.D.N.Y. Apr. 28, 2022) (citing *In re Del Valle Ruiz*, 939 F.3d 520, 533 (2d Cir. 2019)).

Although Applicants cite the Second Circuit's decision in *In re Del Valle Ruiz* as support for their requests, Mot. at 18-19, that decision merely stands for the point that "the location of responsive documents and electronically stored information . . . does not establish a *per se* bar to discovery under § 1782." 939 F.3d at 533 (quoting *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200 (11th Cir. 2016)). The Second Circuit reasoned that because the Federal Rules of Civil Procedure authorize discovery of documents located abroad if the documents are in the "possession, custody, or control" of a party within the court's jurisdiction, Section 1782 "likewise allows" courts to authorize such discovery. *Id.* at 533. However, the court went on to state the location of the documents could weigh against allowing the discovery:

> [W]e join the Eleventh Circuit in holding that a district court is ***not categorically barred*** from allowing discovery under § 1782 of evidence located abroad. ***That said***, we note that ***a court*** may properly, and in fact ***should***, ***consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery***.

*Id.* (citation omitted; emphasis added). Accordingly, contrary to Applicants' assertion that Mr. Jafar "must" provide his documents, regardless of location, Mot. at 18, the Court, in fact, "should[] consider the location of documents" in "deciding whether to exercise its discretion to authorize such discovery[.]" *Del Valle Ruiz*, 939 F.3d at 533. Here, the location of the documents, combined with the fact that Mr. Jafar does not reside, work, or regularly transact business in New York (or the United States), emphasizes the "unduly burdensome and invasive" nature of the Subpoenas

and weighs heavily against authorizing such discovery.  *In re Hranov*, 2022 WL 1261827, at *7; *see also, e.g.*, *Almaty*, 2023 WL 2088173, at *2.

Notably, only ***one*** of the many Section 1782 cases cited in Applicants' brief (*Edelman*, discussed below) appears to have involved a foreign national who, like Mr. Jafar, did not reside or work in the United States, and that case ***supports Mr. Jafar's position***.  The remainder of the cases involved respondents who were either individuals residing within the court's district or corporate entities transacting business in the district.  *In Re Del Valle de Ruiz* (cited in Mot. at 18), the respondent was a company located in New York over which the court had general jurisdiction.  939 F.3d at 531.  Similarly, in *In re Gemeinschaftspraxis Dr. Med. Schottdorf* (cited in Mot. at 19), the respondent was a consulting firm headquartered in New York City.  No. M19-88(BSJ), 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006).  And in *Sergeeva* (cited in Mot. at 18), the respondent was a company based in Atlanta.  834 F.3d at 1196.

The remainder of the Section 1782 cases cited by Applicants, which did not address extraterritorial discovery, likewise involved individuals residing in, or corporate entities doing business in, the relevant district.  For example, in the *In re Abraaj* opinion cited repeatedly by Applicants (*see, e.g.*, Mot. at 10), the court had general or specific personal jurisdiction over each of the respondents, all of which were banks doing business in New York, and the discovery requests concerned transfers routed through New York bank accounts.  *In re Abraaj Inv. Mgmt. Ltd.*, No. 20-MC-229(VSB), 2023 WL 2674752, at *4-*5 (S.D.N.Y. Mar. 29, 2023).[15]

---

[15]   *See also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 251 n.5 (2004) (cited in Mot. at 12) (respondent was company located in California); *In re Hornbeam Corp.*, 722 F. App'x 7, 9 (2d Cir. 2018) (cited in Mot. at 13) (respondents were "banks and other entities within the Southern District of New York"); *Mees*, 793 F.3d at 295 n.3 (cited in Mot. at 17) (respondent was New York resident); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 78 (2d Cir. 2012) (cited in Mot. at 12) (respondents were one individual and two corporate entities located in

The Second Circuit's *Edelman* decision (cited in Mot. at 12-13), supports a finding in favor of Mr. Jafar, particularly with respect to the deposition Subpoena.  In *Edelman*, the respondent, a French citizen who lived and worked in France, was served with a subpoena for deposition testimony and documents while visiting an art gallery on a trip to New York.  295 F.3d at 174. Interpreting Section 1782's requirement that a subpoenaed party "resides or is found" within the district of the district court authorizing a subpoena under the statute, 28 U.S.C. § 1782(a), the Second Circuit held that a person may be "found" within the district when "so-called tag jurisdiction" is established by serving a foreign national who is temporarily physically present within the district.  *Edelman*, 295 F.3d at 179.

However, the Second Circuit cautioned that its ruling that the respondent was "found" within the district for purposes of Section 1782 "does not mean that [respondent] must be deposed."  *Id.* at 180-81.  The court stated that "Rule 45 may bar the deposition notwithstanding our holding that [respondent] is not beyond the scope of § 1782(a)" and ordered the district court, on remand, to "consider whether Rule 45(c)(3)(A)(ii) [now Rule 45(d)(3)(A)] require[d] the

---

New York); *Gushlak v. Gushlak*, 486 F. App'x 215, 217-18 (2d Cir. 2012) (cited in Mot. at 13) (respondents were two individuals living in New York); *In re Metallgesellschaft AG*, 121 F.3d 77, 78 (2d Cir. 1997) (respondent was New York resident); *In re Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (cited in Mot. at 14) (party challenging subpoena "acknowledge[d] that those from whom the information is sought (including herself) are found" in the district); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995) (cited in Mot. at 16) (respondent was New York company); *In re FourWorld Event Opportunities LP*, No. 22-MC-55(PHX)(DWL), 2023 WL 155863, at *1 (D. Ariz. Jan. 11, 2023) (cited in Mot. at 17) (respondent was Arizona resident); *Laggner v. Parsa*, No. 3:22-MC-80328(WHO), 2023 WL 163579, at *2 (N.D. Cal. Jan. 11, 2023) (cited in Mot. at 17) (respondents were individuals residing in District of Northern California); *In re Kuwait Ports Auth.*, No. 20-MC-46(ALC), 2021 WL 5909999, at *6-*7 (S.D.N.Y. Dec. 13, 2021) (cited in Mot. at 17) (respondents were companies doing business in New York and discovery concerned fund transfers through New York bank accounts); *In re Batbold*, No. 21-MC-218(RA)(OTW), 2021 WL 4596536, at *2 (S.D.N.Y. Oct. 6, 2021) (cited in Mot. at 18) (respondent was company doing business within Southern District of New York).

subpoena to be quashed" on the ground that respondent did not live, work, or regularly transact business within the district and was not an "officer" of a party in the French litigation and thus could not be compelled to give testimony more than 100 miles from where he lived and worked.[16] *Id.* at 181.   Under Rule 45's current wording, it is clear that the respondent in *Edelman* would ***not*** be required to sit for a deposition.  In the words of the Second Circuit, under Section 1782, "***many, subject to being subpoenaed, may be found; but few will be deposed***."   *Id.* at 173 (emphasis added).  Accordingly, given the undue burden that would result to Mr. Jafar, particularly given the location of both Mr. Jafar and his documents abroad, the Court should quash the Subpoenas.

Additionally, it should not escape the Court's notice that the Subpoenas seek discovery that is broader in scope than what the Cayman Court has ***already decided*** is relevant.  *Compare* ECF No. 15 at 17-18 *with* Goucke Decl., Ex. C ¶ 7.  This, coupled with the fact that Applicants have, in fact, received documents from Mr. Jafar through the Cayman Litigation, shows that the third *Intel* factor weighs against allowing discovery because the Application appears to be an attempt to circumvent the relief already afforded by the Cayman Court.

### B.  Applicants' Delay Also Weighs Heavily Against Allowing Discovery

Another factor the Court should consider in determining whether to exercise its discretion to authorize the Subpoenas is Applicants' extreme delay in pursuing this discovery from Mr. Jafar and in particular the fact that Applicants have waited until the virtual eve of trial.  *See Almaty,* 2023 WL 2088173, at *1 (stating, where plaintiffs served nonparty foreign national with Rule 45 deposition subpoena after end of fact discovery when nonparty was in district to attend related

---

[16]  "Rule 45 was amended in 2013 to resolve a split among federal courts . . . as to the Rule's applicability to subpoenaing *parties* and *party officers* who reside or transact business outside the 100-mile subpoena radius of the trial court."  *Saget v. Trump*, 351 F. Supp. 3d 251, 253 (E.D.N.Y. 2019) (citations omitted; emphasis in original).

trial, "***Plaintiffs' failure to seek this testimony earlier through Rule 45 or the Hague process is reason alone to grant the motion to quash.***") (citations omitted; emphasis added).

"While delay is not specifically listed as an *Intel* factor, the Second Circuit has made clear that a request for assistance under section 1782 that is 'inexcusably timely' would not provide an 'efficient means of assistance to the foreign proceedings,' which is one of the twin aims of the statute." *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 351 (S.D.N.Y. 2019) (quoting *Nascimento v. Faria*, 600 F. App'x 811, 812 (2d Cir. 2015)); *see also WinNet*, 2017 WL 1373918, at *8 ("WinNet brought this § 1782 proceeding one year after initiating the Reorganization Case and a month after its third loss in that case. . . . [T]his delay lends credence to the idea that WinNet's application is an attempt to circumvent the decisions already issued by the Russian courts and/or to harass [respondent].") (citations omitted).[17]

Significantly, the Cayman Litigation was filed ***three years ago***, in September 2020, and trial begins ███████████ Applicants plainly knew all along that Mr. Jafar is not subject to the jurisdiction of the Cayman Court. Yet, they fail to explain why they have waited so long to pursue discovery directly from Mr. Jafar, either in a 1782 application or through letters rogatory to the UAE (which Applicants admit they have never pursued). Applicants' sudden urgency for seeking Mr. Jafar's documents was not necessitated by any new discoveries. The papers

---

[17]     *See also In re Elvis Presley Enters. LLC*, No. 15-MC-386(DLC), 2016 WL 843380, at *4 (S.D.N.Y. Mar. 1, 2016) (delay weighed against granting discovery where § 1782 application was filed two weeks before hearing in German court); *In re Caratube Int'l Oil Co., LLP*, 730 F. Supp. 2d 101, 106-07 (D.D.C. 2010) (denying § 1782 petition filed "less than a month before discovery between the parties was to close"); *In re Digitechnic*, No. C07-414(JCC), 2007 WL 1367697, at *5 (W.D. Wash. May 8, 2007) (denying petition, stating "[g]iven [applicant's] complete failure to justify the timing of this request, the Court finds little difficulty with the idea that the instant discovery proceedings will unduly burden [respondent].").

accompanying the Application show that ████████████████████████████

████████████████████████████████

Applicants' delay would also result in undue burden to Mr. Jafar given the imminent start date for the Cayman Litigation trial. As the court in *Aventis Pharma v. Wyeth* explained in denying a Section 1782 petition "on the eve of an appeal":

> Even if the parties proceed with the utmost diligence and good faith to get the production completed, there will likely be disagreement over the documents at issue which will add additional time for completion of the production. This Court sees no reason why it should support [the applicant] in seeking to compel [the respondent] to participate in a 'fire drill' over documents when the French appeal is currently pending. Since the timing of [respondent's] request places a burden on [respondent] so great that they cannot produce the requested documents in time for the French appeal, the documents requested are not available for use in the French proceedings.

No. M-19-70(DAB), 2009 WL 3754191, at *2 (S.D.N.Y. Nov. 9, 2009) (citation omitted).

## **CONCLUSION**

For the foregoing reasons, Respondent respectfully requests that the Court issue an Order quashing the Subpoenas in their entirety, and for such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
       October 6, 2023

Respectfully submitted,

**CADWALADER, WICKERSHAM & TAFT LLP**

 /s/    *Nicholas A. Gravante, Jr.*
Nicholas A. Gravante, Jr.
Amanda L. Devereux
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 504-6666
nicholas.gravante@cwt.com
amanda.devereux@cwt.com

*Attorneys for Respondent*
*Badr Abdelhameed Dhia Jafar*